UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| TARA N. GODBOLT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:16-cv-30085-KAR |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant.[1] | ) | |

<u>MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR JUDGMENT
ON THE PLEADINGS AND DEFENDANT'S MOTION FOR ORDER AFFIRMING THE
DECISION OF THE COMMISSIONER</u>
<u>(Dkt. Nos. 11 & 15)</u>

ROBERTSON, U.S.M.J.

## I.    Introduction

Pursuant to 42 U.S.C. § 405(g), Plaintiff Tara N. Godbolt ("Plaintiff") appeals the

decision of the Acting Commissioner of the Social Security Administration ("Commissioner"),

denying her claim for Social Security Disability Insurance ("SSDI").  Plaintiff asserts that the

Commissioner's decision denying her such benefits – memorialized in a January 22, 2016

decision by an administrative law judge ("ALJ") – is in error.  Specifically, Plaintiff alleges that

the ALJ erred in assessing her Residual Functional Capacity ("RFC"), first, by not assigning

controlling weight to a treating physician's opinion and, second, by not including any

manipulative limitation as supported by two state agency opinions.  Plaintiff has moved for

judgment on the pleadings, requesting that the Commissioner's decision be reversed, or, in the

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Nancy A. Berryhill has been substituted for Carolyn W.
Colvin as Acting Commissioner of the Social Security Administration.

alternative, remanded for further proceedings (Dkt. No. 11). The Commissioner has moved for an order affirming the decision of the Commissioner (Dkt. No. 15). The parties have consented to this court's jurisdiction (Dkt. No. 14). *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73. For the following reasons, the court will deny Plaintiff's motion and allow the Commissioner's motion.

## II. Procedural Background

Plaintiff applied for SSDI on October 9, 2014, alleging an August 25, 2014 onset of disability (Administrative Record ("A.R.") at 142-43). Plaintiff's applications were denied initially and on reconsideration (*id*. at 85-87, 89-91). Plaintiff requested a hearing before an ALJ, and one was held on December 23, 2015 (*id*. at 24-58, 92-93). Following the hearing, the ALJ issued a decision on January 22, 2016, finding that Plaintiff was not disabled and denying Plaintiff's claim (*id*. at 8-22). The Appeals Council denied review on April 1, 2016, and the ALJ's decision became the final decision of the Commissioner (*id*. at 1-5). This appeal followed.

## III. Legal Standards

### A. Standard for Entitlement to Social Security Disability Insurance

In order to qualify for SSDI, a claimant must demonstrate that he or she is disabled within the meaning of the Social Security Act.[2] A claimant is disabled for purposes of SSDI if he "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A claimant is unable to engage in any substantial gainful activity when

---

[2] For SSDI, the claimant also must demonstrate that the disability commenced prior to the expiration of his insured status for disability insurance benefits. *See* 42 U.S.C. § 423(a)(1).

he "is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."  42 U.S.C. § 423(d)(2)(A).

The Commissioner evaluates a claimant's impairment under a five-step sequential evaluation process set forth in the regulations promulgated under the statute.  *See* 20 C.F.R. § 404.1520.  The hearing officer must determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or equals a listed impairment contained in Appendix 1 to the regulations; (4) whether the impairment prevents the claimant from performing previous relevant work; and (5) whether the impairment prevents the claimant from doing any work considering the claimant's age, education, and work experience.  *See id*.  *See also Goodermote v. Sec'y of Health & Human Servs*., 690 F.2d 5, 6-7 (1st Cir. 1982) (describing the five-step process).  If the hearing officer determines at any step of the evaluation that the claimant is or is not disabled, the analysis does not continue to the next step.  20 C.F.R. § 404.1520.

Before proceeding to steps four and five, the Commissioner must make an assessment of the claimant's "residual functional capacity" ("RFC"), which the Commissioner uses at step four to determine whether the claimant can do past relevant work and at step five to determine if the claimant can adjust to other work.  *See id*.  "RFC is what an individual can still do despite his or her limitations.  RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-

related physical and mental activities." Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2 (July 2, 1996).

The claimant has the burden of proof through step four of the analysis, *Goodermote*, 690 F.2d at 7, including the burden to demonstrate RFC. *Flaherty v. Astrue*, No. 11-11156-TSH, 2013 WL 4784419, at *9 (D. Mass. Sept. 5, 2013) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)). At step five, the Commissioner has the burden of showing the existence of other jobs in the national economy that the claimant can nonetheless perform. *Goodermote,* 690 F.2d at 7.

B. Standard of Review

The District Court may enter a judgment affirming, modifying, or reversing the final decision of the Commissioner, with or without remanding for rehearing. *See* 42 U.S.C. § 405(g). Judicial review "is limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000). The court reviews questions of law *de novo*, but must defer to the ALJ's findings of fact if they are supported by substantial evidence. *Id.* (citing *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir.1999)). Substantial evidence exists "'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the] conclusion.'" *Irlanda Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991) (quoting *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981)). "While 'substantial evidence' is 'more than a scintilla,' it certainly does not approach the preponderance-of-the-evidence standard normally found in civil cases." *Bath Iron Works Corp. v. U.S. Dep't of Labor*, 336 F.3d 51, 56 (1st Cir. 2003) (citing *Sprague v. Dir. Office of Workers' Comp. Programs, U.S. Dep't of Labor*, 688 F.2d 862, 865 (1st Cir. 1982)). In applying the substantial

evidence standard, the court must be mindful that it is the province of the ALJ, and not the courts, to determine issues of credibility, resolve conflicts in the evidence, and draw conclusions from such evidence. *Irlanda Ortiz*, 955 F.2d at 769. So long as the substantial evidence standard is met, the ALJ's factual findings are conclusive even if the record "arguably could support a different conclusion." *Id*. at 770. That said, the Commissioner may not ignore evidence, misapply the law, or judge matters entrusted to experts. *Nguyen*, 172 F.3d at 35.

## IV. Facts

### A. Background

Plaintiff was 43 years old at the time of the ALJ's decision (A.R. at 17). She has a high school education and previously worked as a nursing assistant (*id*. at 27). When she applied for SSDI, she alleged disability due to lupus, osteoarthritis, depression, and anxiety (*id*. at 154).[3] At the hearing, Plaintiff also claimed disability as a result of right wrist pain (*id*. at 26).

### B. Medical Evidence

#### 1. Treatment Records

##### a. Knees

On August 7, 2014, Plaintiff was evaluated by Scott Halista, M.D., of the Arthritis Treatment Center for right knee pain (*id*. at 329-333). Dr. Halista noted that Plaintiff had given her notice at work, reporting that she was unable to keep up because of the pain in her right knee (*id*.). While Dr. Halista observed that Plaintiff had full range of motion in her knees, Plaintiff experienced pain with passive range of motion in her right knee (*id*.). Plaintiff was using a right knee brace, and Dr. Halista recommended that she use a cane in her left hand for mobility (*id*.).

---

[3] Plaintiff has not criticized the ALJ's assessment of her mental impairments of anxiety and depression as non-severe and imposing no work-related functional limitations. Accordingly, the court does not address those impairments, other than to note their existence.

Dr. Halista assessed Plaintiff with obesity, chronic lupus erythematosus, and osteoarthritis (*id*.).

He ordered bloodwork, x-rays, and referral to an orthopedic surgeon for possible knee

replacement surgery and counseled Plaintiff to lose weight (*id*.).  The x-rays were taken that

same day.  The findings showed "evidence of moderate medial joint space narrowing with

subchondral bone sclerosis and osteophyte formation," and the presence of osteophytes in the

"lateral and patellofemoral joint compartments" (id. at 290).  The impression was of "[m]oderate

medial right knee joint osteoarthritis" (*id*. at 290).

On September 22, 2014, Plaintiff saw her primary care physician, Rodrigo Salazar, M.D.,

at BMP Northern Edge Adult Medicine (*id*. at 221-223).  Dr. Salazar noted that Plaintiff was

"not doing well" and that she had to leave work because of her right knee, which, despite

wearing a brace, was causing her pain and giving out when she was walking and helping patients

(*id*.).  Dr. Salazar noted that Plaintiff had begun to use a cane to ambulate (*id*.).  Upon

examination, Plaintiff exhibited right knee crepitus, not warm, but with effusion, and no edema

(*id*.).  Dr. Salazar assessed Plaintiff with lupus, depression, rheumatoid arthritis, and arthritis of

the right knee (*id*.).

On September 25, 2014, Plaintiff saw Brian Puchalski, PA-C at New England Orthopedic

Surgeons, for a consultation (*id*. at 453-54).  Plaintiff reported experiencing increased pain in her

right knee over the last several months (*id*.).  She indicated that the pain increased with

prolonged standing, walking, and going up and down stairs, and that she was no longer able to

work as a nursing assistant as a result (*id*.).  Upon examination, Puchalski noted that Plaintiff

walked with a slow, antalgic gait on the right, and had point tenderness along the medial joint

line of her right knee, with effusion and mild warmth (*id*.).  Puchalski observed no ligamentous

instability or edema (*id*.).  Puchalski recommended that Plaintiff defer pursuing knee

replacement in favor of continued non-surgical treatment options, including using her cane and brace, trying an oral anti-inflammatory (other than Naproxen, which gave her stomach upset), repeat cortisone injections, weight loss, and at least one session of physical therapy to get a home exercise program to strengthen the knee (*id*.).

Plaintiff saw Dr. Halista again on November 13, 2014, for continued right knee pain (*id*. at 429-433). Dr. Halista's examination revealed swelling and tenderness to Plaintiff's right knee, and she had less than full range of motion. Dr. Halista assessed Plaintiff with obesity, chronic lupus erythematosus, and osteoarthritis (*id*.). He recommended continued use of the knee brace for pain control and that Plaintiff talk to her PCP for a referral to a nutritionist for help with weight loss (*id*.).

Plaintiff again saw Dr. Halista for worsening right knee pain on June 5, 2015 (*id*. at 466-474). Dr. Halista's examination revealed that Plaintiff did not have full range of motion, and she experienced exquisite tenderness and pain with gentle palpation and gentle range of motion in the right knee (*id*.). Dr. Halista administered an injection and ordered x-rays (*id*.). The x-rays, taken that same day, showed evidence of "severe medial joint space narrowing … [with] subchondral bone sclerosis and marginal osteophyte formation," and "mild patellofemoral joint space narrowing and osteophyte formation" (*id*. at 475). The impression was of "[s]evere right medial and moderate patellofemoral knee joint osteoarthritis" (*id*. at 475).

Plaintiff saw Dr. Halista for a return visit on December 4, 2015 (*id*. at 622-26). Plaintiff indicated that the injection did not provide any relief from the pain in her right knee (*id*.). She described the pain as severe (*id*.). Plaintiff also reported having experienced pain in her left knee for the previous two months (*id*.). Plaintiff presented with a decreased range of motion and pain with passive range of motion in both knees and medial joint tenderness to the left knee (*id*.). Dr.

Halista and Plaintiff discussed obtaining a referral from Plaintiff's PCP for the pain in her right knee (*id*.). An x-ray of her left knee taken that same day showed evidence of "moderate medial joint space narrowing," with an impression of "[m]oderate left medial knee joint osteoarthritis" (*id*. at 629).

### b. Wrist

During her visit with Dr. Halista on August 7, 2014, Plaintiff also reported wrist pain (*id*. at 329-333). Dr. Halista observed that Plaintiff had full range of motion in her fingers, but experienced pain with passive range of motion in her right wrist (*id*.). Plaintiff was using a wrist wrap (*id*.). An x-ray of Plaintiff's wrist taken that same day showed scapholunate dissociation of the right wrist with secondary degenerative changes in the radiocarpal joint (*id*. at 291).

During her November 13, 2014 visit, Dr. Halista observed swelling and tenderness on Plaintiff's right wrist, although she retained full range of motion (*id*.).

Plaintiff saw Dr. Halista again on December 16, 2014, for increasing right wrist pain (*id*. at 434-436). Plaintiff reported that she had been experiencing the pain for two weeks, that it was getting worse, and that she was wearing a brace even at night (*id*.). Dr. Halista observed swelling and tenderness to the right wrist and administered an injection (*id*.). He suggested Plaintiff consider a hand surgery evaluation at New England Orthopedic Surgeons to address the right wrist arthritis (*id*.).

On January 23, 2015, Plaintiff saw Steven Wenner, M.D., of New England Orthopedic Surgeons, who observed that Plaintiff had moderately advanced wrist arthritis with marked restriction of wrist movement (*id*. at 455-56). Plaintiff reported that her wrist pain had started in 2004 when she was involved in a motor vehicle accident, and it had gradually worsened over time to the point where it was hurting all day, every day (*id*.). Plaintiff indicated that Dr. Halista

had administered five to six steroid injections, which had worked quite well and for a reasonably long period of time (*id*.). The most recent injection, however, did not work very well, and the pain in her wrist had worsened (*id*.). Dr. Wenner recommended Plaintiff undergo a right wrist anthrodesis, or surgical immobilization of the joint, and Plaintiff agreed with this course (*id*.).

Dr. Wenner performed the anthrodesis procedure on February 10, 2015 (*id*. at 456-58). On a post-operative visit on February 18, 2015, Dr. Wenner noted that Plaintiff's wound was healing properly and that she had mild swelling, intact sensibility throughout her hand, and good digital range of motion (*id*. at 462). The treatment plan involved a fiberglass cast, along with shoulder, elbow, and hand exercises, with a follow-up in two weeks to get the cast off and sutures out (*id*.).

On March 5, 2015, Miriam K. Wiggins, PA-C, saw Plaintiff and observed minimal edema of the right wrist, full and non-painful digital range of motion, mild tenderness to palpation at the surgical site, and intact extensor pollicis longus ("EPL" - a tendon located over the back of the wrist) strength (*id*. at 463). The treatment plan involved transition from the cast to a wrist splint, physical therapy, and a follow-up in three weeks; Wiggins advised Plaintiff to avoid heavy lifting or use of the right wrist or hand during that time (*id*.).

Plaintiff followed up with Wiggins on March 26, 2015 (*id*. at 464). Examination of the wrist revealed trace edema, no erythema or increased warmth, mild tenderness to palpation at the site of the arthrodesis, no crepitus, and full digital range of motion (*id*.). Plaintiff was to continue wearing her splint, but to remove it for gentle range of motion of her digits, avoid heavy lifting or loading, and follow-up with Dr. Wenner in three weeks (*id*.).

Plaintiff saw Dr. Wenner on April 17, 2015 (*id*. at 485). She had a "minor degree of pain" in the wrist and exhibited no swelling at the surgical site and had full forearm rotation and

digital flexion and extension (*id*.). Dr. Wenner advised Plaintiff to stop using the brace, to continue therapy for three more weeks, and to follow-up with Wiggins in two months (*id*.).

On June 18, 2015, Plaintiff saw Wiggins, who noted she was doing well four months after surgery (*id*. at 551). Plaintiff was pain free, her swelling had resolved, and she had discontinued splinting (*id*.). Wiggins's examination revealed no edema, no crepitus or motion at the fusion site, active digital flexion and extension, and non-irritable forearm range of motion (*id*). Plaintiff was advised to follow-up on an as needed basis (*id*.).

## 2. Primary Care Physician's Opinion

On December 2, 2015, Dr. Salazar completed a questionnaire in largely checkbox form regarding Plaintiff, entitled "Form: Medical Opinion Re: Ability to Do Work-Related Activities" (*id*. at 619-20). Dr. Salazar opined that, during an 8-hour day, Plaintiff could lift and carry less than ten pounds on an occasional basis (no more than 1/3 of an 8-hour day), stand or walk less than two hours, and sit without limitation (*id*.). Dr. Salazar further opined that Plaintiff could sit for 90 minutes and stand for ten minutes before needing to change position and would have to walk for five minutes every five minutes during the day (*id*.). Dr. Salazar checked "yes" in a box indicating that Plaintiff would need to be able to shift at will between sitting and standing/walking; he did not indicate how often he thought this would happen (*id*.). Dr. Salazar further opined that Plaintiff could only occasionally twist, stoop, and climb stairs, and could never crouch or climb ladders (*id*.). Dr. Salazar attributed these limitations to Plaintiff's "severe knee osteoarthritis" (*id*.). Dr. Salazar indicated that Plaintiff's ability to reach, finger (fine manipulation), handle (gross manipulation), and feel were unaffected by her impairments, but that her ability to push and pull was affected because pushing requires good knee support, which, he indicated, Plaintiff does not have (*id*.). Regarding environmental limitations, Dr. Salazar

opined that Plaintiff should avoid even moderate exposure to extreme cold and extreme heat and should avoid concentrated exposure to high humidity, fumes, odors, dusts, gases, soldering fluxes, solvents/cleaners, and chemicals (*id*.).  Dr. Salazar noted that Plaintiff required a cane to ambulate due to her severe knee osteoarthritis (*id*.).  Finally, in checkbox form and without narrative explanation, Dr. Salazar indicated that Plaintiff would be absent more than four days per month from work as a result of her impairments or treatment (*id*.).

3.  <u>State Agency Opinions</u>

K. Melin Weeratne, M.D., a state agency expert who reviewed Plaintiff's medical records as of December 2014, assessed Plaintiff as being limited to occasional lifting and carrying no more than ten pounds and frequent lifting and carrying less than ten pounds (*id*. at 58-69).  Dr. Weeratne indicated that Plaintiff should stand or walk for a total of no more than two hours and sit for a total of about six hours in a workday (*id*.).  Dr. Weeratne imposed no limitations on Plaintiff's ability to push or pull, including operation of hand and/or foot controls, other than the lift and carry restrictions (*id*.).  Dr. Weeratne also determined that Plaintiff could only occasionally climb ramps or stairs, climb ladders/ropes/scaffolds, balance, stoop, kneel, crouch, and crawl (*id*.).  Dr. Weeratne assessed Plaintiff as having a handling limitation, indicating that she may be limited to occasional handling on the right only (*id*.).  Finally, Dr. Weeratne indicated that Plaintiff should avoid concentrated exposure to vibration and even moderate exposure to hazards, including machinery and heights (*id*.).

J. Ordman, M.D., a state agency expert who reviewed Plaintiff's medical records on reconsideration as of April 2015, found similar limitations to Dr. Weeratne, except that he found that Plaintiff could frequently lift and carry up to ten pounds, could never climb ladders/ropes/scaffolds, and could frequently balance (*id*. at 70-82).

C.  Plaintiff's Statements

    1.  *Function Reports*

Plaintiff completed a Function Report on October 19, 2014 (id. at 160-67) and

Questionnaires on Pain on October 19, 2014 (*id*. at 168-69) and March 16, 2015 (*id*. at 178-79).

In the Function Report, Plaintiff indicated that she was living in an apartment with her son and

two daughters (*id*. at 160-67).  Regarding her daily activities, Plaintiff reported that she did

"everything" for her daughters, including dressing and feeding them, and, with the help of her

son, bathing them (*id*.).  Plaintiff also stated that she did laundry, ironing, and cleaning, also with

some help from her son (*id*.).  Plaintiff reported that she drove and shopped weekly for food,

clothing for her daughters, or cleaning supplies for her apartment (*id*.).  Plaintiff reported some

problems with personal care owing to her wrist pain (*id*.).  According to Plaintiff, her hobbies

and interests included reading daily, watching television, and playing board games with her

children (*id*.).  Plaintiff reported regular church attendance (*id*.).  Plaintiff stated that her

conditions affected her ability to lift, squat, bend, stand, walk, kneel, climb stairs, see, and use

her hands (*id*.).  Plaintiff reported that she can lift only ten pounds (*id*.).

In the Pain Questionnaires, Plaintiff identified daily and weekly activities, including

childcare for her two daughters, household chores, driving, and shopping if needed (*id*. at 168-

69, 178-79).  Plaintiff indicated that her pain affected her ability to play with her children and

bathe them (*id*.).

    2.  *Plaintiff's Testimony*

Plaintiff testified that, for 25 years, until 2014, she worked as a nursing assistant in a

nursing home (*id*. at 28).  She left her job because her right knee began giving out on her at work

when she was working with residents (*id*. at 28-29).  At the time of the hearing, Plaintiff testified

that she had pain in both of her knees as a result of osteoarthritis, but that the pain was worse in her right knee (*id.* at 29). Plaintiff described the pain as a stabbing, excruciating pain, which she experiences all the time (*id.*). Plaintiff indicated that she has received cortisone shots and undergone physical therapy to try to help with the pain, but that the treatments were of limited utility (*id.* at 30). Plaintiff testified to using a cane all of the time for balance and to using topical treatments and a heating pad on her knee, in addition to medications, to try to help relieve the pain (*id.* at 30). According to Plaintiff, the pain worsens with walking, standing, and using the stairs (*id.*). Plaintiff also testified that she experiences swelling in her knees, particularly in humid conditions (*id.*).

Plaintiff indicated that she also suffers from lupus, for which she had been taking medications for about five years (*id.* at 31). Plaintiff's symptoms include fatigue and an aching pain in her knees, shoulders, and, sometimes, her left foot, as well as swelling in her knees and shoulders (*id.* at 31-32). Plaintiff testified that the pain from the lupus comes and goes and is exacerbated by humid weather (*id.* at 31).

Plaintiff testified regarding a surgery she had to her right wrist (*id.* at 32). Plaintiff indicated that she still experienced pain in the wrist at times because it was "still healing," and that the pain was mainly associated with humid weather (*id.* at 32-33). Plaintiff testified that, as a result of her wrist condition, she has difficulty picking things up, opening jars or bottles, and manipulating buttons and zippers (*id.*).

Plaintiff testified that she is able to sit for only half of an hour before needing to get up, to stand for ten minutes before needing to sit down, and to walk less than a block (*id.* at 34). Plaintiff indicated that climbing stairs is very difficult for her, but she does have to climb stairs where she lives (*id.*). Plaintiff described difficulty sleeping, with her pain waking her at night

and limiting her to five to six hours of sleep per night (*id*. at 34-35).  As a result, Plaintiff

indicated that she is tired during the daytime and needs to take naps (*id*. at 35).

Plaintiff indicated that she was living with her sister, and had three children, aged

nineteen, six, and four (*id*. at 27).  Plaintiff drives, cooks, and does dishes, and, with her sister's

help, shops and does laundry (*id*. at 27-28).  Plaintiff testified that her pain sometimes makes her

forget what she was doing or what she was going to do next, and her sister needs to remind her

(*id*. at 36).  Finally, Plaintiff testified to having good days and bad days, with bad days, defined

as days in which she is feeling a lot of pain, outnumbering the good (*id*. at 37).

### D. Vocational Expert's Testimony

The vocational expert (VE) testified that a hypothetical individual of Plaintiff's age,

educational background, and work history, with an RFC for sedentary work, with the additional

limitations of no climbing, kneeling, or crawling; no heights or ladders; no hazards or dangerous

machinery; no foot pedals or rough terrain; no more than occasional stooping, bending,

balancing or twisting; and no vibration or extreme humidity could perform jobs as an

information clerk (DOT # 237.367-022), an appointment clerk (DOT # 237.367-010), and a

companion (DOT # 309.677-010) (*id*. at 38-39).  The VE testified that adding to the first

hypothetical a restriction to unskilled tasks requiring concentration for two-hour time periods

would eliminate the appointment clerk position (*id*.).  Finally, the VE testified that adding to the

second hypothetical that the individual would miss work approximately four times per month

and would be off-task approximately twenty percent of the workday would preclude all work on

a full-time, sustained basis (*id*.).

## V. The ALJ's Decision

To determine whether Plaintiff was disabled, the ALJ conducted the five-part analysis required by the regulations. At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date (*id*. at 13). At the second step, the ALJ found that Plaintiff had severe impairments consisting of: bilateral knee osteoarthritis and lupus (*id*.). The ALJ found that Plaintiff's wrist impairment was not severe because it did not last for 12 months or longer (*id*. at 15). At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (*id*.). Before proceeding to steps four and five, the ALJ found that Plaintiff had the RFC to "perform sedentary work as defined in 20 C.F.R. 404.1567(a)[4] except she can perform no more than occasional stooping, bending, balancing, or twisting. She cannot perform climbing, kneeling, or crawling. She cannot operate foot pedals or walk on rough terrain. She must avoid hazards such as unprotected heights and dangerous moving machinery. She must avoid exposure to extreme humidity and she must avoid vibration" (*id*. at 15). At step four, the ALJ determined that Plaintiff was unable to perform any past relevant work (*id*. at 17). At step five, relying on the testimony of an independent vocational expert, the ALJ determined that Plaintiff could perform jobs found in significant numbers in the national economy taking into account Plaintiff's age, education, work experience, and RFC, and, therefore, Plaintiff was not disabled (*id*. at 17-18).

---

[4] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

## VI.    Analysis

Plaintiff contends that the ALJ's RFC determination is not supported by substantial evidence because the ALJ failed to give controlling weight to the findings of her primary care provider, Dr. Salazar, as expressed in the questionnaire he completed regarding Plaintiff on December 2, 2015, and because he failed to include any manipulative limitation in the RFC as supported by the two state agency opinions.

An ALJ's determination of a claimant's residual functional capacity must be supported by substantial evidence. *Seavey v. Barnhart*, 276 F.3d 1, 10 (1st Cir. 2001). When measuring a claimant's capabilities to perform work-related activities, "an expert's RFC evaluation is ordinarily essential unless the extent of functional loss, and its effect on job performance, would be apparent even to a lay person." *Santiago v. Sec'y of Health & Human Servs.*, 944 F.2d 1, 7 (1st Cir. 1991). This is so because, generally, "an ALJ, as a lay person, is not qualified to interpret raw data in a medical record." *Manso-Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 17 (1st Cir. 1996); *see also Gordils v. Sec'y of Health & Human Servs.*, 921 F.2d 327, 329 (1st Cir. 1990) ("[S]ince bare medical findings are unintelligible to a lay person in terms of residual functional capacity, the ALJ is not qualified to assess residual functional capacity based on a bare medical record.").

SSA regulations provide guidelines for an ALJ to follow in weighing medical opinions. Pursuant to the regulations, an ALJ "[g]enerally gives more weight to medical opinions from [the claimant's] treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative

examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2). Indeed, the regulations require ALJs to give controlling weight to a treating physician's opinion on the nature and severity of a claimant's impairments if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. *Id.* Nevertheless, "[t]he law in this circuit does not require the ALJ to give greater weight to the opinions of treating physicians." *Arruda v. Barnhart*, 314 F. Supp. 2d 52, 72 (D. Mass. 2004) (quoting *Arroyo v. Sec'y of Health and Human Servs.*, 932 F.2d 82, 89 (1st Cir. 1991)). An ALJ is entitled to "downplay the weight afforded a treating physician's assessment of the nature and severity of an impairment where … it is internally inconsistent or inconsistent with other evidence in the record including treatment notes and evaluations by examining and nonexamining physicians." *Id.* "If the ALJ determines that the treating physician's opinion is not entitled to controlling weight, the ALJ must determine the amount of weight to which the opinion is entitled based on the following six factors: (1) '[l]ength of treatment relationship and the frequency of examination,' (2) '[n]ature and extent of the treatment relationship,' (3) '[s]upportability' of the medical opinion, (4) consistency of the opinion 'with the record as a whole,' (5) '[s]pecialization' of the treating source, and (6) 'other factors . . . that tend to support or contradict the opinion.'" *Healy*, 2014 WL 1271698, at *14 (quoting 20 C.F.R. § 404 .1527(c)). The regulations further require the ALJ to "give good reasons" in the decision for the weight given to a treating source's opinion. 20 C.F.R. § 404.1527(c)(2). *See also* SSR 96-2p, 1996 WL 374188 at *5 (July 2, 1996). However, the "ALJ is not obligated to discuss each factor in [the] decision of the weight to give a treating physician's testimony, so long as [the ALJ] give[s] good reasons supported by evidence in the

record." *Pinnick v. Colvin*, 132 F. Supp. 3d 180, 188 (D. Mass. 2015) (citing 20 C.F.R. § 404.1527(c)(2)).

Here, the record contains three RFC evaluations by three physicians: (1) treating primary care physician Dr. Salazar's December 2, 2015 assessment (A.R. at 619-620); (2) state agency physician Dr. Weeratne's December 3, 2014 assessment (*id*. at 58-69); and (3) state agency physician Dr. Ordman's April 30, 2015 assessment (*id*. at 70-82). The ALJ assigned "little weight" to Dr. Salazar's opinion "because the findings contained therein are unsupported by the objective medical evidence, which describes the claimant's osteoarthritis as moderate" (*id*. at 16). The ALJ assigned "greater weight" to the two state agency consultant's opinions "as being most consistent with the medical evidence of record, including the later adduced evidence" (*id*.).

While the ALJ stated that he gave "little weight" to Dr. Salazar's opinion, much of his RFC assessment is, in fact, consistent with it. Regarding exertional limitations, where Dr. Salazar opined that Plaintiff could lift and carry no more than ten pounds and could stand and walk for less than two hours, the ALJ limited Plaintiff to sedentary work, which is consistent with these restrictions. See 20 C.F.R. § 404.1567(a). Regarding postural limitations, Dr. Salazar opined that Plaintiff would be limited to only occasional twisting, stooping, and climbing stairs and no crouching or climbing ladders. The ALJ incorporated these or greater limitations into his RFC, restricting Plaintiff to occasional stooping, bending, balancing, or twisting, and no climbing, kneeling, or crawling. Dr. Salazar opined that Plaintiff's ability to push is affected because "pushing requires good knee support and [Plaintiff] does not have it." Consistent with this opinion, the ALJ included in his RFC assessment that Plaintiff cannot operate foot pedals or walk on rough terrain.

The ALJ's RFC assessment diverged from Dr. Salazar's opinion in only two areas. First, the ALJ did not adopt Dr. Salazar's opinion that Plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, soldering fluxes, solvents/cleaners, and chemicals and should avoid even moderate exposure to extreme cold and extreme heat. This was not error. There is no objective medical evidence supporting Dr. Salazar's opinion that Plaintiff's impairments require her to avoid environmental allergens or irritants or extreme cold or extreme heat, and the ALJ's omission of any such limitations in Plaintiff's RFC is supported by both of the state agency RFC assessments, neither of which include limitations in these areas.

Second, the ALJ did not adopt Dr. Salazar's opinion that Plaintiff would miss more than four days of work per month. Again, the ALJ's reason for assigning "little weight" to this opinion was his finding that it was "unsupported by the objective medical evidence, which describes the claimant's osteoarthritis as moderate" (A.R. at 16). The ALJ's statement is not entirely accurate, but his reasoning is nevertheless sound. While the August 7, 2014 and December 4, 2015 x-rays of Plaintiff's knees showed moderate osteoarthritis, the June 5, 2015 x-ray of Plaintiff's right knee – which took place six months before Dr. Salazar completed his questionnaire – showed severe medial osteoarthritis. The ALJ is correct, however, that Dr. Salazar's opinion that Plaintiff would miss more than four days of work per month is unsupported by any objective medical evidence in the record. It is also contrary to, or at least unsupported by, Plaintiff's self-completed Function Report and Pain Questionnaires, which reveal that she is able to carry out a broad range of daily activities, including caring for her two young daughters, albeit with some limitations. Moreover, Dr. Salazar's opinion that Plaintiff would miss more than four days of work per month is expressed in checkbox form unaccompanied by any narrative explanation. "When considering opinions in the form of

residual functioning questionnaires, other sessions of this court have found that such forms are 'entitled to little weight in the evaluation of disability.'" *Pinnick*, 132 F. Supp. 3d at 190 (citing *Lacroix v. Barnhart*, 352 F. Supp. 2d 100, 112 (D. Mass. 2005)).  Thus, the ALJ did not err in discounting this part of Dr. Salazar's opinion.

The ALJ also did not err in not including any handling limitation despite the two state agency consultants' opinions that Plaintiff "[m]ay be limited to occasional [handling] on the right, only" (A.R. at 66, 78).  The ALJ did not have to adopt every opinion of the two state agency consultants merely because he assigned "greater weight" to their opinions overall, which is what Plaintiff is essentially arguing.  Dr. Salazar did not include any handling limitation in his assessment of Plaintiff's work-related capabilities, and Plaintiff's medical records show that her wrist steadily improved following her surgery such that, by June 18, 2015, Plaintiff's wrist was pain free, her swelling had resolved, she had no edema, and she had active digital flexion and extension, as well as non-irritable forearm range of motion (*id*).  No further treatment was recommended, with Plaintiff only needing to follow up on an as needed basis.  Thus, the ALJ's omission of any handling limitation is supported by substantial evidence.

Moreover, as the Commissioner accurately points out, if the ALJ did commit error in omitting a handling limitation, it was harmless.  The VE identified three jobs that could be performed by an individual with the RFC assessed by the ALJ: information clerk, appointment clerk, and companion (A.R. at 39).  While the appointment clerk and companion jobs require frequent handling, the information clerk position only requires occasional handling.[5]  The VE testified that information clerk jobs exist in significant numbers locally and nationally, satisfying

---

[5] The appointment clerk job corresponds to DOT # 237.367-010, available at 1991 WL 672185; the companion job corresponds to DOT # 309.677-010, available at 1991 WL 672667; the information clerk job corresponds to DOT # 237.367-022, available at 1991 WL 672188.

the Commissioner's burden at step five. *See, e.g., Aho v. Comm'r of Social Security Admin.*, No. 10-40052-FDS, 2011 WL 3511518, at *8 (D. Mass. Aug. 10, 2011). Thus, even if the ALJ should have imposed a handling limitation, Plaintiff would still be found not disabled at step five, and there is no basis for remand. *Ward v. Comm'r of Social Security*, 211 F.3d 652, 656 (1st Cir. 2000) (citing *Dantran, Inc. v. United States Dep't of Labor*, 171 F.3d 58, 73 (1st Cir. 1999); *Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998) ("[A] remand is not essential if it will amount to no more than an empty exercise.").

VII.    Conclusion

For the reasons stated, Plaintiff's motion for judgment on the pleadings (Dkt. No. 11) IS DENIED, and the Commissioner's motion for an order affirming the decision (Dkt. No. 15) IS GRANTED.

It is so ordered.

Dated: Sept. 8, 2017                              /s/ Katherine A. Robertson_____
                                                  KATHERINE A. ROBERTSON
                                                  United States Magistrate Judge